



U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**
SEP 1 2 2007
AT_____ O'CLOCK_____
Lawrence K. Baerman, Clerk - Syracuse

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA,

v.

LINDA JONES and
LESLIE KNOX,

Defendants.

Criminal Action No.

5: 07-CR-**395(DNH)**

**INDICTMENT**
18 U.S.C. § 371
15 U.S.C. § 78 j(b), 78m(a), 78ff; 18 U.S.C. §2

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## THE GRAND JURY CHARGES THAT:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise stated:

I. BACKGROUND

    A.    PENN TRAFFIC

    1.    The Penn Traffic Company ("Penn Traffic") was a Delaware corporation with its headquarters and principal place of business in Syracuse, New York.

    Penn Traffic was a major food retailer in the Eastern United States, operating numerous supermarkets and a wholesale food distribution business serving over 100 licensed franchises and independent operators. Penn Traffic's reported revenue for its 2002 fiscal year, its

last available public filing of a fully audited 10-K report with the United States Securities and Exchange Commission ("SEC"), was approximately $2.4 billion.

2.    Penn Traffic was a publicly traded corporation.

3.    Penn Traffic derived substantial revenue not only from the retail and wholesale sale of products, but also from payments made to it by vendors for promoting, displaying, advertising, and carrying their products.

B.    CERTAIN RELEVANT ACCOUNTING PRINCIPLES

4.    As a public company, Penn Traffic was required to comply with rules and regulations of the SEC. The SEC's rules and regulations were designed to protect members of the investing public by, among other things, requiring that a company's financial information be accurately recorded and disclosed to the SEC and the investing public. Penn Traffic's internal accounting policies concerning recognition of promotional allowances were consistent with Generally Accepted Accounting Principles.

5.    Under the SEC's rules and regulations, Penn Traffic and its officers were required to (a) make and keep books, records and accounts that, in reasonable detail, fairly and accurately reflected the company's business transactions, including its revenue and expenses; (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP"); and (c) file with the SEC quarterly reports (on Form 10-Q) and annual reports (on Form 10-K), that included financial statements that accurately presented Penn Traffic's financial condition and the results of its business operations in accordance with GAAP.

6.  As part of its regular business operations, Penn Traffic routinely provided promotional, display, advertising and product-carrying activities to enhance sales of vendor-supplied merchandise sold in its stores and wholesale operations. Vendors compensated Penn Traffic in exchange for Penn Traffic's performance of these activities and this compensation commonly was referred to as a promotional allowance. Penn Traffic routinely applied these vendor payments, or allowances, to the cost of sales ("COS") line on its financial statements. Applying vendor allowances to the cost of sales line had the effect of reducing the cost of sales and, thus, increasing gross margin and earnings.

7.  Under GAAP, there were two requirements that had to be satisfied before Penn Traffic properly could recognize as revenue these allowances from vendors. First, that revenue had to be realized, or realizable. Second, the revenue had to be earned.

8.  Revenue is 'realized' under GAAP when cash is received in exchange for products supplied or services performed, or when a claim to that cash is made. Revenue is 'earned' under GAAP once the product is delivered or the service is performed. When the business that provided the product or service formally records the revenue in its financial statements, that recording is called 'recognition' under GAAP. Similarly under GAAP, contingencies that might result in gains are not reflected in the accounts since to do so might be to recognize revenue prior to its realization.

9.  When it promoted or advertised a particular product, Penn Traffic would enter into an agreement with the vendor, specifying the terms of the arrangement. Under GAAP, Penn Traffic could properly recognize revenue under such an agreement once it had performed its agreed upon advertising or promotional services. Penn Traffic's completion of that performance would satisfy its obligation to the vendor and, under GAAP, it would have earned the revenue from the vendor called for by the agreement. Under GAAP, expenses have to be matched with revenues as long as

3

it is reasonable to do so. Expenses are recognized when the work or product actually makes its contribution to revenue. The costs of doing business are recorded in the same period as the revenues they help to generate.

10.    Penn Traffic also sought to enhance its sales, and sales of its vendors' products, by agreeing to carry new and additional vendor products, and to offer them for sale to its customers. To do so, Penn Traffic warehoused, distributed and/or presented on its grocery store shelves such additional products. Certain vendors agreed to pay Penn Traffic for these services, which commonly were referred to as 'slotting allowances.' Under GAAP, Penn Traffic was required to complete its performance under such agreements prior to recognizing slotting allowances.

11.    Penn Traffic also entered into agreements with some of its vendors providing for special arrangements to carry certain products and/or to provide specific retail space for designated products. Often, these agreements included provisions calling for an up-front payment from the vendor to Penn Traffic. GAAP required that such up-front payments be recognized equally over the life of the length. For example, under a one-year agreement, a vendor's up-front payment was 'earned', and could properly be recognized under GAAP by dividing the payments into equal monthly amounts for each of the twelve months of the agreement.

12.    Penn Traffic also received periodic payments from vendors to make up for losses attributable to damaged or otherwise unsellable vendor products. These payments generally came from vendor funds called Logistics Development Incentive ("LDI"). LDI funds were set up by vendors to reimburse Penn Traffic and other grocery store chains for products that had been deemed unusable for various reasons, such as damage to cans/boxes incurred during shipment, out-of-date food items or products that had been improperly coded. Generally, in order to avoid having to count

4

and track individual units of unusable items for this reimbursement, vendors would compensate Penn Traffic for a pre-determined small percentage of the total amount of product purchased from the vendor to be in this unusable or LDI category. Penn Traffic would then periodically be reimbursed by vendors for LDI unusable goods using this formula.

C.    THE DEFENDANTS

13.    Defendant LINDA JONES was employed by Penn Traffic beginning in 1979 at the Riverside Division in Pennsylvania.    From 1984 to 1988, JONES worked as a Pricing Coordinator/Buyer. JONES remained employed by Penn Traffic or its predecessor in various related positions in Pennsylvania until she moved to Syracuse, New York as the Vice President of Sales in 1997. JONES was promoted to Vice President of Grocery/Dairy/Frozen in 2000. In 2004, the title changed to Vice President of Non-Perishable Merchandising. Defendant JONES' employment by Penn Traffic ceased in February 2006.

14.    Defendant LESLIE KNOX was employed by Penn Traffic starting on or about May 1999 as the Senior Vice President of Merchandising. KNOX's employment with Penn Traffic ended in February, 2006.    Prior to his employment with Penn Traffic, KNOX began his career in the grocery business in 1969 and continued working in the grocery industry through the time he was hired by Penn Traffic. He had served as Vice President of Merchandising for another grocery retailer for approximately four years.

D.    BUDGETS, FINANCIAL PROJECTIONS AND MARGINS

15.    Following Penn Traffic's emergence from its first bankruptcy in 1999, and continuing through 2003, senior executives at the company communicated to executives and employees that it was very important in the eyes of investors, "Wall Street," and financiers for Penn Traffic to meet

certain periodically-established financial goals and targets. These financial goals and targets were established and monitored internally at Penn Traffic through the preparation of budgets and corresponding periodic financial forecasts. These budgets estimated Penn Traffic's expected future financial performance and were used as benchmarks against which to assess the company's actual financial performance. Key components of these budgets and forecasts included sales, costs of sales and gross profit margin.

16. Penn Traffic's actual financial performance did not consistently meet these financial goals and targets following the company's first bankruptcy in 1999. This caused senior executives at Penn Traffic to pressure company executives and employees to take steps to meet these financial goals and improve the company's financial performance.

E.    THE SCHEME TO DEFRAUD: "PULLING FORWARD"

17.    Prior to, during and subsequent to Penn Traffic's fiscal year 2002, which ended February 2, 2002, defendants JONES and KNOX, with the assistance of subordinates acting at their direction, engaged in a systematic practice of submitting or causing to be submitted to Penn Traffic's accounting department deceptive and false financial information. This deceptive and false information caused allowances from vendors to be pulled from a future period and improperly recorded in a current period, prior to the time it was earned by Penn Traffic. This scheme violated GAAP and caused Penn Traffic's financial performance to be materially misstated, both internally and to the investing public through the filing of false financial statements with the SEC.

18.    This practice commonly was referred to as "pulling forward," because it involved fraudulently recognizing in a current period promotional and other allowances from vendors that would not be legitimately 'earned' by Penn Traffic until a future period. A central goal of the

defendants' scheme of pulling forward was to cause Penn Traffic's accounting department to overstate the company's current financial status, and to make it appear that the company had achieved, or had gotten closer to achieving, its financial goals and projections than it actually had. Defendants JONES and KNOX also sought to enrich themselves by this practice by qualifying for bonuses from Penn Traffic that were, in part, based on false financial information. Pulling forward occurred substantially, but not exclusively, during the last reporting period of a financial quarter or fiscal year.

19.    While pulling forward achieved its central purpose of falsely and materially overstating the company's financial status in certain quarters and fiscal years, it also led to the material misstatement of earnings in subsequent years and quarters. By improperly taking future vendor allowances and causing them to be recognized early, the allowances pulled forward were no longer available for recognition in the period they actually were earned.

20.    In truth, Penn Traffic's actual financial status was not what was reported on its internal and external financial statements during this period. Rather, the activity of the defendants' pulling forward scheme caused Penn Traffic to falsely report earnings and pre-tax operating income to investors and the SEC during fiscal quarters and years, including fiscal years 2002 and 2003. In fact, for fiscal years 2002 and 2003, this practice caused Penn Traffic to improperly recognize and prematurely report several million dollars of vendor allowances. As a result of the pulling forward scheme of these defendants, Penn Traffic's accounting department was caused to make misrepresentations and omissions of material fact in its public filings that were relied upon by members of the investing public.

21.    As part of the practice of pulling forward, the defendant JONES, with the assistance of subordinates acting at her direction, routinely identified advertising and promotional events with vendors planned for the future and estimated the allowances to be paid to Penn Traffic for its future performance of the related advertising or promotional service.  Defendants JONES and KNOX would then direct and cause subordinates and others to create invoice requests and other documents to be submitted to and accepted by Penn Traffic's accounting department.  Accounting would, in turn, create an invoice and mail it to the vendor seeking payment for Penn Traffic's advertising or promotional service, using the information provided in the invoice request.  These invoice requests, however, often falsely described to Penn Traffic's accounting department that the allowances to be paid by the vendor were for advertising or promotional events that had already occurred, when in fact Penn Traffic's performance had not yet taken place.  Once this false financial information was received and relied on by Penn Traffic's accounting department, and vendors were invoiced, the company then prematurely recognized these vendor allowances.  The resulting misstatements of financial information were then included in both the company's internal reporting and external reporting to the SEC, and thus to the investing public.  Such invoice requests caused Penn Traffic to improperly record the vendor allowances for these future events prior to the time Penn Traffic performed its service for the vendor.

22.    As a further part of the pulling forward practice, the defendants JONES and KNOX caused subordinates to prepare and submit to Penn Traffic's accounting department invoice requests that falsely described slotting allowances as other types of allowances, such as advertising or promotional allowances.  By this practice of falsely describing slotting allowances as something else in invoice requests, Penn Traffic's accounting department was deceived into recording these

8

allowances into a current financial period, even though they had not in fact yet been earned by Penn Traffic. This pulling forward activity accomplished one of the scheme's central purposes of causing Penn Traffic to overstate its financial status to regulators and the investing public.

23. As a further part of the pulling forward practice, defendants JONES and KNOX caused subordinates to prepare and submit to Penn Traffic's accounting department invoice requests and/or documentation that deceptively described provisions for signing bonuses or other 'up front' payments in contracts for products and/or store space for products. By this practice of deceptively describing certain contract provisions in invoice requests and/or documentation, Penn Traffic's accounting department was deceived into recording these signing bonueses or up front payments into a current financial period, even though they had not in fact yet been earned by Penn Traffic. This pulling forward activity accomplished one of the scheme's central purposes of causing Penn Traffic to overstate its financial status to regulators and the investing public.

24. Defendants JONES and KNOX, with the assistance of subordinates acting under their direction, pulled forward advertising, slotting and promotional allowance monies from vendors to make up for what otherwise would have been reductions to Penn Traffic's earnings caused by larger than customary LDI/unusable product expenses. Penn Traffic had agreed with certain vendors to be reimbursed for LDI losses on a fixed percentage basis. When the actual amount of LDI/unusable products exceeded the fixed percentage reimbursement level, Penn Traffic had a net expense for LDI, and, thus, reduced earnings. By contrast, when actual LDI/unusable product amounts were less than the fixed reimbursement level, Penn Traffic would have a net gain for LDI/unusables, and thus an increase in earnings. When actual LDI/unusable item amounts rose above the fixed reimbursement levels agreed upon with vendors, and Penn Traffic faced LDI/unusable losses, defendants JONES

9

and KNOX pulled forward by causing vendors to allow Penn Traffic to draw on vendor allowances intended for future promotional activities by Penn Traffic and to record it, prior to the time Penn Traffic had performed those activities, and thus before the allowances had been earned.

25.    Each of these various methods of pulling forward was designed and carried out to deceive Penn Traffic's accounting department and its outside auditors, and by extension the investing public, from learning of Penn Traffic's actual financial status.

F.    SECOND QUARTER OF FISCAL YEAR 2002

26.    The second quarter of Penn Traffic's fiscal year 2002 included the period from on or about May 6, 2001 to on or about August 4, 2001 (the "Second Quarter FY 2002"). By the middle of the Second Quarter FY 2002, Penn Traffic's actual financial performance was below budgeted levels and it appeared as if projected numbers for the Second Quarter FY 2002 would not be achieved. By the last calendar day of the Second Quarter, August 4, 2001, Penn Traffic's actual financial performance was short of projected budgets and forecasts. Before Penn Traffic's accounting department closed the company's books for that quarter, defendants JONES and KNOX directed and caused subordinates to pull allowances forward to falsely inflate the company's actual financial performance.

27.    Both during and at the end of the Second Quarter FY 2002, defendant KNOX communicated to subordinates that the numbers they were projecting to senior management were "unacceptable." On the eve of the company's closing of the books for Period 5 (a monthly period falling in the middle of the Second Quarter FY 2002), defendant KNOX advised subordinates that the Period 5 numbers they had submitted were below what senior management wanted to report to the company's Board of Directors at a meeting scheduled for the following day. He further assigned

each department head a specific dollar figure to hit and a one day deadline by which to do it, stating

that these assigned figures had been "committed to." When advised on July 10, 2001 by one of the

department heads that his department's assigned figured of $2,750 (in thousands) could not be hit

"without doing something goofy," KNOX responded in one sentence: "[g]et your dollars to $2750."

28.     Similarly, when a subordinate reported that his department's actual numbers would be

coming in "below the forecast in the Second Quarter," defendant KNOX stated that the forecasted

numbers were "commitments we made." He further responded "I will expect that number to be hit"

and "[y]ou need to be there," even though he then and there well knew that no further additional

sales were possible, as the calendar period had closed.

29.     To cover up these shortfalls by inflating Penn Traffic's financial numbers for the Second

Quarter FY 2002, defendant JONES caused invoice requests to be prepared and sent to Penn

Traffic's accounting department that included vendor allowances to be pulled forward. These

fraudulent invoice requests caused the company to recognize revenue from these vendor allowances

in the Second Quarter FY 2002 prior to the time it was earned, and thus to misstate its financial

status for that quarter to regulators and the public.

30.     For example, on or about August 14, 2001, defendant JONES signed and dated three

invoice requests for a total amount exceeding $400,000. These invoice requests were dated ten days

after the calendar close of the Second Quarter. Further, they contained language purporting to show

that they related to performance of promotional activities previously completed by Penn Traffic,

when in fact the company had not yet performed.

31.     Also, for example, on or about August 15, 2001, a subordinate who reported to

defendant JONES prepared another series of two invoice requests totaling $56,000. These invoice

requests caused invoices to be prepared and mailed to the respective vendors by the company's accounting department, and the amounts reflected in them to be booked into the Second Quarter FY 2002, prior to the time these vendor allowances had been earned by Penn Traffic.

32.    By further example, on or about August 10, 2001 and August 15, 2001, another subordinate who reported directly to defendant JONES prepared a series of four invoice requests totaling $16,000 involving several vendors. These invoice requests, dated well after the end of the calendar close for the Second Quarter FY 2002, also caused invoices to be prepared and mailed to the respective vendors by Penn Traffic's accounting department, and the amounts reflected in them to be booked into the Second Quarter FY 2002, prior to the time these vendor allowances had been earned by Penn Traffic.

33.    By way of further example, on or about August 11, 2001, yet another subordinate who reported directly to defendant JONES, prepared a series of eight invoice requests totaling $135,000 and involving several more vendors. These invoice requests, again dated well after the end of the calendar close for the Second Quarter FY 2002, caused invoices to be prepared and mailed to the respective vendors by Penn Traffic's accounting department, and the amounts reflected in them to be booked into the Second Quarter FY 2002, prior to the time these vendor allowances had been earned by Penn Traffic. These invoice requests each falsely described the underlying basis for the payment to Penn Traffic as a merchandising allowance, when in fact the actual basis was future slotting allowances that had been pulled forward and that could not properly have been recognized in the Second Quarter FY 2002. In aggregate, the overstatement of allowances in the Second Quarter of FY 2002 represented approximately a twelve percent understatement of the company's pre-tax operating loss.

G.    FOURTH QUARTER OF FISCAL YEAR 2002

34.    The Fourth Quarter of Penn Traffic's fiscal year 2002 included the period from on or about November 4, 2001 through February 2, 2002 ("Fourth Quarter FY 2002"). Penn Traffic's Fiscal Year 2002 end coincided with the end of its Fourth Quarter on February 2, 2002. Shortly before the end of the Fourth Quarter FY 2002, and the end of FY 2002, the company's actual financial performance was short of its projected budgets and forecasts. Before Penn Traffic's accounting department closed the company's books for that quarter, defendants JONES and KNOX directed and caused subordinates to pull allowances forward to falsely inflate the company's actual financial performance.

35.    Shortly before the end of the Fourth Quarter FY 2002 and FY 2002, defendant KNOX communicated to subordinates that the numbers for the quarter and the fiscal year were again below projected budgets and forecasts, but this time were within range of qualifying JONES and others for bonuses. In that communication, KNOX advised JONES and others of budgeted and actual numbers in several of the core reporting categories used to calculate certain bonuses, and stated: "We need to make plans for January to cement this. Empty the coffers. I want to pass out incentive checks."

36.    After the Penn Traffic calendar close of the Fourth Quarter FY 2002 and FY 2002, but before the accounting department had closed the books for those periods, defendant KNOX again advised department heads that the company was "committed to hit" the target numbers, even though he then knew that the calendar close had occurred and no further sales were possible within the reporting period.

37.    To inflate Penn Traffic's financial performance for the Fourth Quarter FY 2002 and for FY 2002, which simultaneously had the effect of increasing the likelihood of qualifying for and/or

the amount of company-paid bonuses, defendants JONES and KNOX caused invoice requests and other documentation to be prepared and sent to Penn Traffic's accounting department that included vendor allowances to be pulled forward. These fraudulent and deceptive invoice requests and documents caused the company to recognize allowances from vendors in the Fourth Quarter FY 2002 and for FY 2002 prior to the time they were earned, and to misstate its financial performance for the quarter and fiscal year to the SEC and the public.

38.    For example, on or about February 14, 2002, a subordinate who reported to defendant JONES prepared an invoice request for the amount of $34,000. This same subordinate, at or about the same time, also prepared an invoice request for the amount of $10,000 concerning another vendor. These invoice requests falsely claim they are based on "additional" promotional activity by Penn Traffic in January for the designated vendors. In fact, the invoice requests were based on slotting allowances that had not then been earned by Penn Traffic and related to future periods.

39.    On or about February 8, 2002, a subordinate who reported directly to defendant KNOX prepared an invoice request for $15,000 relating to a Valentine's Day promotion to be run by Penn Traffic. Even though related to a Valentine's Day promotion, the invoice request directs the company's accounting department to apply this vendor funding "to period 12," which was within the Fourth Quarter and FY 2002, rather than in the first quarter of fiscal year 2003.

40.    On or about February 12, 2002, subordinates who reported to defendant JONES prepared a series of nine invoice requests to one vendor totaling $385,000. Those invoice requests pulled forward from promotional and advertising funding expected to be paid to Penn Traffic by the vendor at some time in the future and caused Penn Traffic's accounting department to record these allowances in Quarter Four of FY2002 and FY 2002 before they had been earned. These invoice

14

requests falsely identified this revenue as earned and relating to LDI/unusable product payments from the vendor. In fact, however, these vendor allowances had not been earned and related to future promotional and advertising activities and not LDI at all. Corresponding invoices were prepared by accounting and mailed to the vendors.

41.    In early 2002, defendant KNOX caused a subordinate to open negotiations with a vendor on a purchasing contract that was not expected to commence until 2003. Defendant KNOX directed that the contract include a $250,000 up-front payment that he wanted to be recorded as revenue to Penn Traffic in Quarter Four of FY 2002 and FY 2002. This $250,000 amount was booked in the last period (Period 12) of Quarter Four in FY 2002, even though the contract was never signed or put into effect and the company did not receive the $250,000 from the vendor.

42.    Also in early 2002, defendant JONES directed a subordinate to negotiate contracts with two vendors and to ensure that 10% of the value of each contract be identified as a one-time "signing bonus" so as to induce the company's accounting department to record the corresponding amounts as revenue in Quarter Four of FY 2002. In fact, relying on this documentation, accounting did record $244,440 in Quarter Four of FY 2002 as a "placement" bonus, even though the contracts did not commence until February of 2002 and each ran for a period of three years, and all this revenue would not properly be recognized in Quarter Four of FY 2002 as revenue under GAAP. To be recognized under GAAP, these payments would need to be evenly spread over the life of the contracts – from February of 2002 through February of 2005. In aggregate, the overstatement of allowances in the Fourth Quarter of FY 2002 represented approximately a forty percent understatement of the company's pre-tax operating loss. In aggregate, the overstatement of allowances for FY 2002 represented approximately a twelve percent understandment of the company's pre-tax operating loss.

H.    PENN TRAFFIC'S FISCAL YEAR 2003, QUARTERS ONE, TWO, AND THREE

43.    Penn Traffic's Fiscal Year 2003 began on February 3, 2002 and ended on February 1, 2003 ("FY 2003"). The first quarter of FY 2003 began on February 3, 2002 and ended on May 4, 2002 ("First Quarter 2003"). The second quarter began on May 5, 2002 and ended August 3, 2002; and the third quarter of FY 2003 began on August 4, 2002 and ended on November 2, 2002 ("Third Quarter 2003").

44.    At the close of First Quarter 2003, defendants KNOX and JONES informed subordinates that the company was short of its financial targets for period 3 of FY 2003, the final monthly reporting period for the First Quarter 2003. Approximately two weeks after sales for Period 3 had closed, defendant JONES then caused subordinates to pull forward promotional allowances from vendors into Period 3. The allowances were not earned by Penn Traffic in Period 3 and were not expected to be earned until June and July of 2002. To accomplish this pulling forward, the subordinate sent a communication dated May 16, 2002 to a number of vendors advising them that Penn Traffic would be billing them then for promotional allowances tied to June and July advertisements. The communication identifies both the activity: pulling forward June and July promotional monies into April (period 3 of the First Quarter 2003); and the purpose of the activity: "to make our period 3 April number." Further, the communication requests that a representative of each vendor sign and/or create documentation to deceive Penn Traffic's accounting department into believing that these allowances properly could be recognized in Period 3, when in fact they could not.

45.    To further inflate the company's financial performance for the First Quarter FY 2003, defendants JONES and KNOX caused invoice requests and other documentation to be prepared and

sent to Penn Traffic's accounting department that included allowances to be pulled forward. For example, on or about May 9, 2002 and May 14, 2002, a subordinate who reported to defendant JONES prepared a series of invoice requests to two vendors involving a total amount of $86,000. These invoice requests falsely claim the vendor allowances were earned by Penn Traffic in April (Period 3), when in fact they related to future promotions and/or slotting allowances that had not yet occurred.

46.     Further, on or about May 13, 2002, defendants JONES and KNOX caused a subordinate who reported to defendant JONES to prepare an invoice request in the amount of $5,000 to another vendor. The invoice request states the bill to the vendor will represent promotional activity by Penn Traffic in April, when in fact it is pulling forward anticipated vendor allowances from the future unrelated to activity in April.

47.     On or about August 15, 2002, defendant KNOX communicated directly to defendant JONES and her subordinates after the calendar close of the Second Quarter FY 2003, but before the company's accounting department was directed to close the books for that quarter, that defendant JONES' grocery department was "still behind $720K." Defendant KNOX stated in the communication that "[w]e cannot miss this number," that each recipient "needs to make sure that you are contributing your portion:" and he "expect[ed] money to be going over to Linda [defendant JONES] today." At or about that time, subordinates prepared invoice requests to pull forward to achieve that objective. For example, two recipients of KNOX's e-mail prepared two invoice requests to two different vendors totaling $30,000. These invoice requests falsely identified that they were tied to promotional activities performed by the company within the Second Quarter FY 2003, when in fact they were tied to future performance outside of the Second Quarter FY 2003.

17

48.    Similarly, on or about August 14, 2002, an invoice request was prepared by one of defendant JONES' subordinates in the amount of $50,000. That request also sought to pull vendor allowances into the Second Quarter FY 2003, when in fact it was for promotional activity to be performed by the company in the future and not in the Second Quarter FY 2003. The corresponding invoice to the vendor was dated August 15, 2002.

49.    The pulling forward practice continued in the Third Quarter of FY 2003. After the calendar close of the Third Quarter, the company's accounting department sent an internal communication to senior management proposing to close the books for "period 9" (the end of the Third Quarter FY 2003) at a particular date and time. Defendant KNOX, within minutes, sent a response to senior executives and the accounting department requesting that the company's books be held open beyond the time and day proposed by accounting. Shortly thereafter, but prior to the closing of the company's books for the Third Quarter of FY 2003, the following transactions occurred. On or about November 14, 2002, a subordinate reporting to defendant JONES prepared an invoice request to bill a vendor in the amount of $7,000. When that invoice request was submitted to accounting, it claimed to be related to "October promotional support" on behalf of the vendor and backed up by a "note from vendor." In fact, the vendor sent two notes within minutes of each other – the first one falsely stating that the $7,000 was for "Lump Sum Allowance for October" and the second identifying what was actually being done – future performance by the company outside of October and FY 2003. At the head of the second back up note, the vendor representative referenced the two notes, stating "First one is for accounting. This [the second note identifying future performance] is for you and me."

50.    A further example of pulling forward occurred on or about November 14, 2002.  The morning after being contacted directly by defendant JONES, a vendor representative sent a communication, dated November 14, 2002, to a subordinate of defendant JONES stating "Here is work sheet to Pre Bill scans – Total amount is $50,000 based on worksheet – OK to bill as October performance...."  That same day, the subordinate prepared a series of three invoice requests for that vendor totaling $50,000.  A worksheet attached to the vendor representatives' communication sets forth future performance required by the company, outside of the Third Quarter of FY 2003, to earn this $50,000.  In aggregate, the overstatement of allowances in the Third Quarter of FY 2003 represented an approximate 200 percent understatement of the company's pre-tax operating loss.

## COUNT ONE
### (Conspiracy to Commit Securities Fraud and Mail Fraud)

51.    The allegations set forth in paragraphs 1 through 50 are realleged and incorporated as if fully set forth in this paragraph.

52.    On or about and between 2000 and 2003, both times being approximate and inclusive, within the Northern District of New York and elsewhere, defendants LINDA JONES and LESLIE KNOX, together with others, did knowingly and willfully, directly and indirectly, conspire:

(a)    to commit fraud in connection with the purchase and sale of securities issued by Penn Traffic, in violation of Title 15, United States Code, Sections 78j(b), and Title 17, Code of Federal Regulations, Section 240.10b-5;

(b)    to cause to be made false and misleading statements of material fact in reports and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, in violation of Title 15, United States Code, Section 78ff;

19

(c)   to falsify Penn Traffic's books, records and accounts, the making and keeping of which was required by Title 15, United States Code, Section 78m(b)(2)(A) and Title 17, Code of Federal Regulations, Section 240.13b2-1, in violation of Title 15, United States Code, Sections 78m(b)(5) and 78ff;

(d)   to circumvent Penn Traffic's internal accounting controls, which were required by Title 15, United States Code, Section 78m(b)(2)(B), in violation of Title 15, United States Code, Sections 78m(b)((5) and 78ff; and

(e)   to devise a scheme and artifice to obtain money and property from Penn Traffic shareholders, by means of materially false and fraudulent pretenses, representations and documents, and for the purpose of executing such scheme and artifice, and attempting to do so, did cause invoices and related documents to be placed in an authorized depository for mail matter envelopes containing invoices addressed to representatives of certain vendors of Penn Traffic to be delivered by the United States Postal Service, in violation of Title 18, United States Code, Section 1341.

53.   In furtherance of the conspiracy and to effect its objects, within the Northern District of New York and elsewhere, the defendants JONES and KNOX, together with others, committed and caused to be committed, among others, the following:

## OVERT ACTS

(a)   On or about June 28, 2001, KNOX sent an email to JONES and others stating that the financial numbers turned in to date in period 5 were "unacceptable" and "we need to go back to the well and produce more dollars."

20

(b)    On or about July 10, 2001, KNOX sent an email to JONES and others advising that numbers for period 5 were "short" and identifying target numbers for various departments, adding "we need to pull all the stops to make this period work."

(c)    On or about July 10, 2001, KNOX having received an email from a subordinate claiming his department could not hit his target number for period 5 "without doing something goofy," responded by directing the subordinate to "get your dollars" to the target number.

(d)    On or about August 12, 2001, KNOX responded by email to a subordinate who claimed his department would be short of projected numbers, stating "....we still need to be at the numbers we talked to last Tuesday. Those were commitments we made. I will expect that number to be hit. You need to be there."

(e)    On or about August 14, 2001, JONES signed an invoice request for $129,118.34.

(f)    On or about August 14, 2001, JONES signed an invoice request for $137,846.53.

(g)    On or about August 14, 2001, JONES signed an invoice request for $139,040.

(h)    On or about August 15, 2001, KNOX and JONES caused Penn Traffic's accounting department to prepare an invoice to be sent to a vendor in the amount of $50,000.

(i)    On or about August 15 and August 16, 2001, KNOX and JONES caused Penn Traffic's accounting department to prepare a series of four invoices to be sent to vendors in the aggregate amount of $16,000.

(j)    On or about August 15, 2001, KNOX and JONES caused Penn Traffic's accounting department to prepare a series of eight invoices to be sent to vendors in the aggregate amount of $135,000.

(k)    On or about January 18, 2001, KNOX sent an email to JONES and others identifying budgeted and actual year to date figures, urging department heads to "empty the coffers" and linking making "Plan" to the award of "incentive checks."

(l)    On or about February 21, 2002, KNOX and JONES caused Penn Traffic's accounting department to prepare a series of two invoices to be sent to vendors in the aggregate amount of $44,000.

(m)    On or about February 19, 2002, JONES caused Penn Traffic's accounting department to prepare a series of nine invoices to be sent to a single vendor in the aggregate amount of $385,000.

(n)    On or about February 22, 2002, KNOX caused Penn Traffic's accounting department to prepare an invoice to be sent to a vendor in the amount of $15,000.

(o)    On or about February 11, 2002, KNOX caused Penn Traffic's accounting department to record $250,000.00 in revenue for a vendor contract that was not signed or executed.

(p)    On or about February 19, 2002, JONES caused Penn Traffic's accounting department to prepare a series of seven invoices to be sent to vendors in the amount of $244,400.

(q)    On or about May 16, 2002, KNOX sent an email to JONES and others identifying $685,000 in "additional money" he wanted secured "to close P3/Q1," citing the significance of "finish[ing] the first quarter of the year on a positive note" to both the recipient of the email and "our investors."

(r)    On or about May 16, 2002, JONES met with subordinates and directed them to cause Penn Traffic to bill vendors for future promotional activity.

(s)   On or about May 16, 2002, after a meeting with JONES and at the behest of JONES, an e-mail was sent to certain vendors stating that they would be billed then for promotional activity planned for June and July of 2002 to assist the company "to make our period 3 April number."

(t)   On or about August 15, 2002, KNOX sent an email to JONES and her subordinates stating "[a]s of yesterday, grocery was still behind $720K" and advising them: "We cannot miss this number.  I will expect money to be going over to Linda [JONES] today."

(u)   On or about August 14, 2002, JONES caused Penn Traffic's accounting department to prepare an invoice to be sent to a vendor in the amount of $50,000.

(v)   On or about September 18, 2002, KNOX and JONES caused Penn Traffic to file with the SEC an amended annual report on Form 10K-A that was materially false and fraudulent.

(w)   On or about September 18, 2002, KNOX and JONES caused Penn Traffic to file with the SEC a quarterly report on Form 10-Q that was materially false and fraudulent.

(x)   On or about November 12, 2002, KNOX caused Penn Traffic's books for the Third Quarter of FY 2003 to be held open in order to allow Penn Traffic to record additional allowances in that quarter.

(y)   On or about December 17, 2002, KNOX and JONES caused Penn Traffic to file with the SEC a quarterly report on Form 10-Q that was materially false and fraudulent.

All in violation of Title 18, United States Code, Section 371.

### COUNT TWO
### (Securities Fraud)

23

54.   The allegations set forth in paragraphs 1 through 50 and 53 and realleged and incorporated as if fully set forth in this paragraph.

55.   In or about and between 2000 and 2003, both times being approximate and inclusive, within the Northern District of New York and elsewhere, defendants LINDA JONES and LESLIE KNOX, together with others, did knowingly and willfully, directly and indirectly, use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10-b 5), and that the defendants, together with others, did knowingly and willfully, directly and indirectly:  (1) employ devices, schemes and artifices to defraud; (2) make and cause to be made untrue statements of material fact and omit to state material facts necessary in order to make statements made, in light of the circumstances under which there were made, not misleading; and (3) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of Penn Traffic securities and by use of the mails.

All in violation of Title 15, United States Code, Section 78j(b) and ff; Title 18, United States Code, Section 2.

### COUNTS THREE THROUGH FIVE
### (False SEC Filings)

56.   The allegations set forth in paragraphs 1 through 50 and 53 are realleged and incorporated as if fully set forth in this paragraph.

57.   On or about the dates listed below, within the Northern District of New York and elsewhere, the defendants LINDA JONES and LESLIE KNOX, together with others, did

24

unlawfully, willfully, and knowingly, cause to be made statements in reports and documents required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit, the filings listed below, each constituting a separate count:

| Count | Filing | Approximate Date of Filing |
|-------|--------|----------------------------|
| Three | Form 10-K and 10-K-A for the Penn Traffic Company for the fiscal year ended February 2, 2002 | May 3, 2002, as amended by the filing of September 18, 2002 |
| Four | Form 10-Q for the Penn Traffic Company for the fiscal quarter ended August 3, 2002 | September 18, 2002 |
| Five | Form 10-Q for the Penn Traffic Company for the fiscal quarter ended November 2, 2002 | December 17, 2002 |

In violation of Title 15, United States Code, Section 78m (a) and 78ff; Title 17, Code of Federal Regulations, Section 240.13a-1; Title 18, United States Code, Section 2.

A TRUE BILL

FOREPERSON

GLENN T. SUDDABY
United States Attorney

By:

Stephen C. Green
Assistant United States Attorney
Bar Roll No. 507767

Thomas Capezza
Assistant United States Attorney
Bar Roll No. 503159